Filed 12/30/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re SHANNON MARIE O'CONNOR<br><br>on Habeas Corpus. | H049878<br>(Santa Clara County<br>Super. Ct. No. C2113375) |

## I. INTRODUCTION

Defendant Shannon Marie O'Connor is currently held in pretrial custody on charges of 39 offenses involving 15 minor victims over a period of nine months. The trial court denied release on bail due to the seriousness of the charged offenses, which include 12 counts of felony child endangerment (Pen. Code, § 273a, subd. (a)),[1] along with evidence showing that less restrictive conditions of release on bail would not protect the public or the minor victims.

O'Connor filed a petition for a writ of habeas corpus contending that the trial court erred and she was entitled to bail as a matter of law. This court summarily denied the petition. O'Connor sought review by the California Supreme Court, which granted her petition for review and transferred the matter to this court with directions to vacate our summary denial.

The Supreme Court also directed that "[t]he Sheriff of Santa Clara County is to be ordered to show cause why relief should not be granted on the grounds (1) petitioner has not been charged with '[f]elony offenses involving acts of violence on another person, or felony sexual assault offenses on another person' (Cal. Const., art. I, § 12, subd. (b)); and

---

[1] All further statutory references are to the Penal Code.

(2) if it is the case she has not been charged with any such qualifying offenses, she 'shall be released on bail' (*id*., § 12; but see *id*., § 28, subd. (f)(3))."

For the reasons stated below, we conclude that O'Connor has been charged with qualifying felony offenses involving an act of violence on another person within the meaning of California Constitution, article I, section 12, subdivision (b) (hereafter, section 12 or section 12(b)). We also conclude that the trial court did not abuse its discretion in denying bail. We will therefore deny the petition for a writ of habeas corpus.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*

Our summary of the facts and circumstances underlying the offenses charged in the first amended complaint is drawn from the October 6, 2021 statement of facts and declaration provided by the district attorney's investigator.

Defendant O'Connor is the parent of victim John Doe 3. During an eight-month period when John Doe 3 was 14 years old, O'Connor allegedly "supplied excessive amounts of alcohol to her son and his minor friends to the point where minors would vomit, be unable to stand, and fall unconscious. When these minors were extremely intoxicated from the alcohol, she encouraged them to engage in sexual activity with each other, facilitated sexual encounters, and watched some of these sexual encounters."

O'Connor also helped the minors to leave their homes surreptitiously at night or in the early morning hours without their parents' knowledge, by communicating with the minors via Snapchat or text message and picking them up down the street from their homes. O'Connor would then drive the minors to her home where she would provide them with alcohol.

The facts that are the basis for the 12 counts of felony child endangerment (§ 273a, subd. (a)) alleged in the first amended complaint are included in the following summary. Sometime between June 1, 2020, and August 1, 2020, John Doe 6, age 14, attended a

2

summer party at O'Connor's home where O'Connor provided alcohol to minors. John Doe 6 became so intoxicated that he lost consciousness in the bathroom and woke up to vomit more. O'Connor told Jane Doe 10 (age 13-14) she was on John Doe 6 duty, and when Jane Doe 10 asked if they should call 911, O'Connor said no.

On September 18, 2020, John Doe 2 and other minor boys were at O'Connor's home drinking alcohol that she provided. A video recording of that day shows John Doe 2 losing consciousness due to alcohol intoxication and upon waking, muttering incoherent words and losing consciousness again.

Between September 18, 2020, and February 10, 2021, O'Connor was known to have messaged John Doe 1 multiple times per day, to the point that she became his "best friend" on Snapchat. In the messages O'Connor told John Doe 1 which girls he should "hook up" with and asked him "how was it?" after he had intimate encounters with the girls, including Jane Doe 7. To facilitate the sexual encounter with Jane Doe 7, O'Connor used John Doe 1's phone to contact Jane Doe 7 and pretend that she was John Doe 1. O'Connor was aware that John Doe 1 had been diagnosed with an inflammatory bowel disease and nevertheless supplied John Doe 1 with alcohol on multiple occasions to the point that he vomited and became unconscious.

During the weekend of October 2-5, 2020, O'Connor rented a cottage in Santa Cruz to hold a birthday party for her son, John Doe 3. In a group Snapchat, O'Connor asked the minors what kind of alcohol they wanted at the party and told them to keep the party a secret. O'Connor was the only adult present at the party, which was attended by an estimated 12 minors. O'Connor ordered two large deliveries of alcohol to the cottage and was seen in videos of the party interacting with intoxicated minors. One video shows John Doe 4, age 14, so intoxicated that he slurred his words, was unable to stand, and repeatedly fell over.

O'Connor organized a Halloween party at her home on or about October 30-31, 2020, and told the minor boys in a Snapchat conversation to tell their parents it was a

3

ping pong and basketball party. Before the party, O'Connor called the Los Gatos Police Department and asked them to call her before responding to any issues, stating that no one would answer the door if the police did not call first. She explained that the neighbors frequently called the police about her, but the police department could not substantiate such calls.

A few days before the Halloween party, O'Connor brought approximately eight cases of beer and two bottles of hard liquor to her home and had several minors hide the alcohol in her backyard. During the party, minors became intoxicated and four girls passed out. Jane Doe 1, age 14, broke her finger, an injury that required surgery. When John Doe 5, age 14, was picked up by his father, he was extremely intoxicated and vomited several times after arriving home.

From December 1, 2020 to February 14, 2021 Jane Doe 4, age 14, spent a significant amount of time at O'Connor's home, where O'Connor provided Jane Doe 4 with alcohol and Jane Doe 4 became extremely intoxicated. Jane Doe 4 did not comply when O'Connor sought to have her engage in sexual conduct with John Doe 1, until one day when Jane Doe 4 was extremely intoxicated. At that time, Jane Doe 4 was in a hot tub with John Doe 1 and John Doe 3 until she got out to lie down in a room because she was not feeling well. O'Connor brought John Doe 1 into the room and left. John Doe 1 then digitally penetrated Jane Doe 4 while she was too intoxicated to resist. O'Connor returned to the room and, when Jane Doe 4 asked O'Connor why she had left John Doe 1 alone with her when she knew what he would do, O'Connor laughed. John Doe 1 was so intoxicated he does not remember digitally penetrating Jane Doe 4.

On December 19, 2020, O'Connor drove John Doe 1, John Doe 2, and John Doe 3 in her car while they were drinking alcohol. At some point they arrived at the parking lot of Los Gatos High School. While there, O'Connor encouraged an unlicensed minor to drive her SUV while John Doe 2 and John Doe 3 were hanging on the back of the car.

4

While the car was moving, John Doe 2 lost his grip, fell off the SUV, and hit his head. John Doe 2 was unconscious for 20 to 30 seconds.

While John Doe 2 remained unconscious, O'Connor and the other boys attempted to pick him up and put him in the SUV, but they were unable to do so and repeatedly dropped him. A bystander asked O'Connor if they needed help, but she told him to mind his own business. The bystander called 911, and a Los Gatos police officer responded to the scene. The officer observed O'Connor and John Doe 2 in the SUV, which had a large amount of vomit inside. John Doe 2 told the officer he had been car sick and O'Connor said she had come to pick him up.

O'Connor then drove John Doe 2 to her home so he could change clothes because he had vomited on himself. Next, O'Connor dropped John Doe 2 near his home without telling his parents about his condition. After John Doe 2 made it home in his intoxicated state, he spent the night vomiting and almost drowned in the bathtub. John Doe 2 had a bad headache the next day and saw a doctor who confirmed that John Doe 2 had a concussion.

Several months later, Jane Doe 4's mother contacted Los Gatos High School after Jane Doe 4 told her about John Doe 1's concussion. The school contacted John Doe 3, who then asked John Doe 1 and John Doe 2 to lie about the incident so O'Connor would not get in trouble. Before John Doe 1 and John Doe 2 were to meet with the high school vice-principal, O'Connor contacted John Doe 1 and told him to lie about the incident and deny that John Doe 2 had hit his head on the school campus. O'Connor and John Doe 3 also provided exact statements via Snapchat to John Doe 1 and John Doe 2 before the meeting. John Doe 1 and John Doe 2 then lied about drinking, O'Connor's presence during the incident, and how John Doe 2 was injured as a result of O'Connor's direction.

On December 31, 2020, O'Connor hosted a party for five minors, including John Doe 1, Jane Doe 3, John Doe 3, Jane Doe 4, and Jane Doe 6 (age 14). All the minors except Jane Doe 6 were drinking while in the hot tub. O'Connor was sitting next to Jane

Doe 6 when Jane Doe 6 saw John Doe 1 digitally penetrate Jane Doe 3 in the hot tub. Jane Doe 3 and John Doe 1 became extremely intoxicated and were taken from the hot tub and placed in a bathroom. Later that evening O'Connor and all five minors ended up in John Doe 3's bedroom. When Jane Doe 3 went to the bathroom, John Doe 1 followed her. Upon returning to the bedroom, Jane Doe 3 was crying and said that John Doe 1 made her bleed. O'Connor laughed and asked John Doe 1, as if it were funny, "what did you do?" During the same evening, John Doe 1, while inebriated, climbed on Jane Doe 6 and touched her breasts and buttocks against her will while they were both lying on John Doe 3's bed. O'Connor was present and laughed when Jane Doe 6 told John Doe 1 to get off her.

On February 15, 2021, O'Connor took minors John Doe 3 and Jane Doe 2 on a trip to Lake Tahoe where she was the only adult present. Before the trip, O'Connor told Jane Doe 2's parents that Jane Doe 2 would share a room with O'Connor's step-daughter, there would be no alcohol, and the minor boys would not be allowed in Jane Doe 2's room. However, Jane Doe 2 was the only girl on the trip and she became extremely intoxicated. A video from the trip shows Jane Doe 2 walking at night in a snow-filled parking lot while wearing a bikini. When Jane Doe 2 returned inside, John Doe 3 exposed himself and she engaged in sexual activity with him against her will. Jane Doe 2's parents asked her to return early and O'Connor and John Doe 3 provided Jane Doe 2 with a story to tell her parents so that she would deny drinking alcohol.

B. *Procedural Background*

### 1. First Amended Felony Complaint

The first amended felony complaint charges O'Connor with 39 counts involving 15 minor victims. The charges include 12 felony counts of endangering or injuring the health of a child (§ 273a, subd. (a)) and multiple misdemeanor counts of sexual battery (§ 243.4, subd. (e)(1)), child endangerment involving unjustifiable pain and suffering where great bodily injury or death is not likely (§ 273a, subd. (b)), annoying or molesting

6

a child (§ 647.6(a)(I)), and selling, furnishing, giving or causing to be sold, furnished or given an alcoholic beverage to a person under 21 (Bus. & Prof. Code, § 25658(a)).

### 2. Bail Motions

In October 2021 the district attorney filed a motion to hold O'Connor in custody on no bail on the grounds that O'Connor posed a danger to the victims and the public and detention was necessary to assure her presence at trial since she had fled to Idaho before charges were filed. During the October 20, 2021 arraignment the trial court granted the motion and set bail at no bail without prejudice.

O'Connor filed a motion for pretrial release in January 2022. She argued that she had a right to release on bail because the felony offenses of child endangerment do not fall within the section 12(b)(3) exceptions to the right to bail, and the district attorney had not shown by clear and convincing evidence that she posed a danger to the victims or the public, or that she was a flight risk. O'Connor asserted that she no longer had access to the victims through her son, since he had moved to Texas to live with his father. O'Connor also argued she was not a flight risk because there was no showing of intention to flee and she had been accepted into the Options GPS Program for house arrest. O'Connor stated that she had no history of failing to appear in court and was able to rent a house in Santa Clara County.

The district attorney opposed O'Connor's motion for pretrial release, contending that the trial court was authorized to deny bail pursuant to section 12(b)(3) because O'Connor's actions led to the minor victims sustaining serious injuries and suffering sexual assaults. Alternatively, the district attorney argued that California Constitution, article I, section 28(f)(3) (hereafter section 28(f)(3) expanded the trial court's authority to deny bail to dangerous defendants whose offenses did not fall within the section 12(b)(3) exceptions, who posed a flight risk, and for whom nonfinancial conditions of release were insufficient to ensure public and victim safety and the defendant's appearances in court.

O'Connor posed a risk of danger and was a flight risk, the district attorney asserted, as shown by her conduct while in custody in addition to her offenses of child endangerment and the potential for a lengthy prison sentence. While O'Connor was in jail in Idaho awaiting extradition to Santa Clara County, she called her son, John Doe 3, to persuade him not to cooperate with the investigation, and John Doe 3 agreed. Then, while O'Connor was in custody in Santa Clara County jail in the current case and in a criminal fraud case, she made a jail telephone call to her husband in which she attempted to conceal her assets. O'Connor instructed her husband to withdraw funds from her bank account in cash and discussed her transfer of their residential property to his name as his sole property. Further, the district attorney argued, home detention was insufficient to protect the victims and the public, since O'Connor had a significant history of using electronic devices to exploit the personal relationships she cultivated with the minor victims.

### 3. Bail Hearings

During the bail hearing held on January 18, 2022, the trial court heard statements from some of the victims and their parents in opposition to bail. Jane Doe 8 stated that she and her sister "most fear [O'Connor] having access to her devices, phones, and using social media as her platform to connect with me and my sister and continue to inflict more harm, harass, and create emotional stress upon us." Jane Doe 4 stated that O'Connor had left her with "sickening memories" and she would feel very "scared and unsafe" if O'Connor were released on bail. The mother of Jane Doe 4 said she was afraid of what O'Connor might do to her family and her children and that O'Connor was a "master manipulator" of both adults and children.

The mother of Jane Doe 2 similarly stated she was afraid for her family and that O'Connor had harassed and intimidated children. Jane Doe 3 provided a statement that she was also afraid of O'Connor and that O'Connor had taught her to lie and damaged her relationship with her parents. The victims and their parents also stated their concerns

8

that O'Connor would flee if released on bail and escape being brought to justice. At the conclusion of the bail hearing, the trial court continued the matter to February 3, 2022, to allow O'Connor to file a reply to the district attorney's opposition to her motion for release on bail.

The trial court heard statements from additional victims and parents of victims during the February 3, 2022 bail hearing. Jane Doe 6 stated that she would be unsettled if O'Connor were released. The father of Jane Doe 4 stated that the victims and their families did not want O'Connor to be released and then cause trauma to other victims, and they would not feel safe if O'Connor was released on bail because she knows where they live. The father of John Doe 3, O'Connor's first husband, informed the court that O'Connor and her current husband had attempted to hide John Doe 3 from him when he arrived in Idaho. The mother of Jane Doe 6 explained how O'Connor manipulated the victims by contacting them directly through Snapchat and phone calls and isolating them from their parents. The father of Jane Doe 3 stated that if O'Connor were released on bail it would be impossible to protect current and future victims from her "expert skill set and social media hypermanipulation."

### 4. Trial Court Order

At the conclusion of the February 3, 2022 bail hearing, the trial court ruled from the bench that O'Connor's motion for release on bail was denied and set custody at no bail, for several reasons. First, the trial court found that violence had been inflicted upon the minor victims, who had been injured and sexually assaulted under O'Connor's direction or supervision.

Second, the trial court found that "there is no reason to believe that the defendant, who has already left the state and tried to dissuade witnesses, tried to hide or secure cash or assets while in custody and facing dozens of felony charges, would respect a Court's order to remain either in her home or the state or any other protective orders that the

9

Court could impose." The court found by clear and convincing evidence that less restrictive conditions of release on bail would not protect the public or the minor victims.

Third, although O'Connor did not have a history of prior convictions, the trial court noted that she was facing another criminal case for fraud and had attempted to conceal assets in connection with that offense.

Fourth, because O'Connor had engaged in dissuading witnesses while in custody and had attempted to conceal assets, the trial court was concerned that she would not comply with court orders. The court was also concerned that O'Connor would not appear in court since she did not live in Santa Clara County and the victim witnesses had stated their concerns that O'Connor would flee.

Finally, the trial court found that based on the evidence that had been submitted, there was "a high likelihood that these charges will be found to be true after a jury trial."

### 5. Writ Proceedings and Remand

O'Connor filed a petition for a writ of habeas corpus contending that the trial court erred and she was entitled to bail as a matter of law. This court summarily denied the petition. O'Connor sought review by the California Supreme Court, which granted her petition for review and transferred the matter to this court with directions to vacate our summary denial.

The Supreme Court also directed that "[t]he Sheriff of Santa Clara County is to be ordered to show cause why relief should not be granted on the grounds (1) petitioner has not been charged with '[f]elony offenses involving acts of violence on another person, or felony sexual assault offenses on another person' (Cal. Const., art. I, § 12, subd. (b)); and (2) if it is the case she has not been charged with any such qualifying offenses, she 'shall be released on bail' (id., § 12; but see id., § 28, subd. (f)(3))."

This court vacated our summary denial, issued an order to show cause as directed, and allowed further briefing and oral argument. The district attorney filed a return to the petition for a writ of habeas corpus and O'Connor filed a traverse.

10

## IV. DISCUSSION

O'Connor contends she is eligible for release on bail since she has not been charged with a qualifying offense that would permit denial of bail pursuant to section 12(b) because, as pleaded, the felony offenses of child endangerment do not allege that she committed acts of violence. Our analysis begins with an overview of the legal principles that guide bail determinations.

### A. *Legal Principles*

"Habeas corpus is an appropriate vehicle by which to raise questions concerning the legality of bail grants or deprivations." (*In re McSherry* (2003) 112 Cal.App.4th 856, 859-860.) Our Supreme Court has recognized that "those incarcerated pending trial— who have not yet been convicted of a charged crime—unquestionably suffer a 'direct "grievous loss" 'of freedom in addition to other potential injuries. [Citation.]" (*In re Humphrey* (2021) 11 Cal.5th 135, 142 (*Humphrey*).) Therefore, " '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.' [Citation.]" (*Id.* at p. 155.)

Limited exceptions are set forth in section 12:[2] "Our cases have recognized that defendants charged with noncapital offenses are generally entitled to bail. [Citation; see Cal. Const., art. I, § 12.) But article I, section 12 provides for exceptions in particular circumstances when a defendant is charged with at least one felony offense. (Cal. Const., art. I, § 12, subds. (b), (c).)" (*In re White* (2020) 9 Cal. 5th 455, 462 (*White*).)

---

[2] Section 12 provides in part: "A person shall be released on bail by sufficient sureties, except for: [¶] (a) Capital crimes when the facts are evident or the presumption great; [¶] (b) Felony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based upon clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others; or [¶] (c) Felony offenses when the facts are evident or the presumption great and the court finds based on clear and convincing evidence that the person has threatened another with great bodily harm and that there is a substantial likelihood that the person would carry out the threat if released."

**B.** *Section 12(b)*

At issue in the present case is the exception provided by section 12(b), which states that defendants in noncapital cases "shall be released on bail by sufficient sureties" except for "[f]elony offenses involving acts of violence on another person, or felony sexual assault offenses on another person, when the facts are evident or the presumption great and the court finds based upon clear and convincing evidence that there is a substantial likelihood the person's release would result in great bodily harm to others."

"To deny bail under article I, section 12(b), a court must satisfy itself that the record contains not only evidence of a qualifying offense sufficient to sustain a hypothetical verdict of guilt on appeal, but also clear and convincing evidence establishing a substantial likelihood that the defendant's release would result in great bodily harm to others. In reviewing a denial of bail, an appellate court must determine, too, whether the record contains substantial evidence of a qualifying offense—and, if so, whether any reasonable fact finder could have found, by clear and convincing evidence, a substantial likelihood that the defendant's release would result in great bodily harm to one or more members of the public. Where both elements are satisfied and a trial court has exercised its discretion to deny bail, the reviewing court then considers whether that denial was an abuse of discretion. (*White*, *supra*, 9 Cal.5th at p. 471.)

Following the Supreme Court's direction, we must first determine whether O'Connor is charged with " '[f]elony offenses involving acts of violence on another person, or felony sexual assault offenses on another person' (Cal. Const., art. I, § 12, subd. (b))." (*White*, *supra*, 9 Cal.5th at p. 471.) We then consider whether the trial court's order denying bail to O'Connor satisfies each element of the decision to deny bail pursuant to section 12(b) as instructed in *White*, *supra*, 9 Cal.5th at page 471.

### 1. Qualifying Offense Under Section 12(b)

O'Connor argues section 12 "controls the initial question of whether a defendant is entitled to bail," and she has not been charged with a qualifying offense under section

12(b) because, as pleaded, the felony offenses of child endangerment do not allege "physical violence, physical force, beating, or striking the victims." O'Connor maintains that she is alleged to have endangered the minor victims' health through the ingestion of alcohol, not through the use of force.

The district attorney responds that section 12, properly interpreted, does not require an allegation that the defendant personally inflicted an injury on the victim for the felony to involve an act of violence within the meaning of section 12(b). The district attorney also argues that the trial court did not abuse its discretion in finding that O'Connor's felony offenses of child endangerment involved acts of violence because her "repeated enablement, instigation, and encouragement of underage drinking, sexual assault, and extreme recklessness all 'played some part' in the physical violence that followed."

We apply the rules governing the interpretation of constitutional provisions to determine whether O'Connor's charged felony offenses of child endangerment (§ 273a, subd. (a)) fall within this provision of section 12, which was added to section 12 by legislative amendment (Assembly Const. Amend. No. 14 (1982)) and approved by voters at the primary election held June 8, 1982. (See Ballot Pamp., Primary Elec. (June 8, 1982).)

" 'In construing constitutional and statutory provisions, whether enacted by the Legislature or by initiative, the intent of the enacting body is the paramount consideration.' " (*Legislature v. Eu* (1991) 54 Cal.3d 492, 505.) "[T]the language used in a statute or constitutional provision should be given its ordinary meaning, and '[i]f the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' [Citation.] To that end, we generally must 'accord[ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose,' and have warned that '[a] construction making some words

13

surplusage is to be avoided.' [Citations.]" (*People v. Valencia* (2017) 3 Cal.5th 347, 357 (*Valencia*).) We may look to dictionary definitions to determine the ordinary meaning of the language in a constitutional provision. (*In re Gadlin* (2020) 10 Cal.5th 915, 933.)

We commence by construing the language in section 12(b) authorizing denial of bail where the defendant is charged with "[f]elony offenses involving acts of violence on another person." Significantly, section 12(b) does not list any specific violent felony offenses within its provision for felony offenses that qualify for the denial of bail, although the Legislature has listed specific violent felonies in defining a violent felony in other penal statutes. (See, e.g., § 667.5, subd. (c) [" 'violent felony' means any of the following"].) We deduce that because the Legislature declined to enumerate specific offenses in section 12(b), the drafters must have intended the broad phrase, "[f]elony offenses involving acts of violence on another person", to encompass conduct beyond "violent felonies" that are defined in and can be charged under the Penal Code. This interpretation of section 12(b) is also supported by the ordinary meaning of "involving," since the dictionary definition includes "to engage as a participant," "to oblige to take part," "to have within or as part of itself," or "to relate closely." (Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/involve [as of Dec. 27, 2022], archived at: <https://perma.cc/FZD3-FZDW>.) The dictionary definition of "violence" is "physical force so as to injure, abuse, damage, or destroy." (<http://www.merriam-webster.com/dictionary/violence > [as of Dec. 27, 2022], archived at: <https://perma.cc/YJU9-LEJ5>.) Thus, an "act of violence on another person" is defined as an act using physical force to injure, abuse, damage, or destroy another person.

Applying the dictionary definitions, the ordinary meaning of the phrase "felony offenses involving an act of violence on another person" in section 12(b) may be understood to include felony offenses committed by a direct participant in the act of using physical force to injure another person. However, the phrase "felony offenses involving an act of violence on another person" may also include an indirect participant—one

14

whose felony offense is "related closely" to an act of violence that injured another person.

We find support for this conclusion in *White*, in which our Supreme Court ruled that bail was properly denied where the defendant was charged with qualifying offenses under section 12(b) although the defendant was not a direct participant in the acts of violence. (*White*, *supra*, 9 Cal.5th at p. 464.) In that case, the defendant did not dispute that he was charged with offenses involving acts of violence or sexual assault, including attempted kidnapping with intent to commit rape (§ 209, subd. (b)), assault with intent to commit rape (§ 220, subd. (a)(1)), contact with a minor with intent to commit a sexual offense (§ 288.3, subd. (a)), and false imprisonment (§§ 236, 237, subd. (a)). (*Id*. at p. 458.) (*White*, *supra*, 9 Cal.5th at p. 458.) However, the defendant argued that bail could not be denied under section 12(b) because there was not a great likelihood that he would cause great bodily harm to others, since he had not aided and abetted his codefendant who had physically assaulted the minor victim with intent to rape. (*Id*. at p. 463.)

Our Supreme Court in *White* rejected the defendant's argument, finding that there was substantial evidence showing that the defendant had been aware of his codefendant's intent to rape and had acted to further it, by encouraging his codefendant to select the victim and acting as a lookout. (*White*, *supra*, 9 Cal.5th at p. 464.) The court concluded that because the record contained substantial evidence to support a finding that the defendant had aided and abetted his codefendant's assault with intent to rape, the offense qualified under section 12(b) for denial of bail due to the likelihood of great bodily harm to others if the defendant were released on bail, even though the defendant was not a direct participant in the acts of violence on the minor victim. (*Id.* at pp. 467-468.)

In this case, O'Connor has been charged with 12 counts of felony child endangerment under section 273a, subdivision (a), which provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or

15

mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

Guided by the decision in *White*, we are not limited to the language in the pleadings (here, the complaint), as O'Connor argues, in determining whether the 12 counts of felony child endangerment (§ 273a, subd. (a)) constitute qualifying felony offenses under section 12(b). (See *White*, *supra*, 9 Cal.5th at p. 471.) Similar to the defendant in *White*, the record reflects that O'Connor indirectly participated in the acts of violence on the victims, since O'Connor's conduct was closely related to the acts of violence that underlie several of the felony charges of child endangerment. According to the district attorney's investigation, O'Connor acted to further the minor victim's acts of violence on each other by providing them with alcohol and encouraging sexual assaults and reckless conduct by the intoxicated minors that resulted in serious injuries. We next consider whether, as directed by *White*, *supra*, 9 Cal.5th at pages 463-465, the record contains evidence of the qualifying felony offenses of child endangerment sufficient to sustain a verdict of guilt.

### 2. Evidence of a Qualifying Offense Sufficient to Sustain a Guilty Verdict

The second element in determining whether bail may be denied was also addressed by our Supreme Court in *White*: "Like most states, California allows courts to deny bail when the facts underlying the qualifying charge are 'evident' or the 'presumption great.' (Art. I, § 12(b); [Citation.] . . . Our court, in step with the broad consensus that has since emerged in other states, has interpreted this odd terminology to require evidence that would be sufficient to sustain a hypothetical verdict of guilt on appeal. [Citations.]" (*White*, *supra*, 9 Cal.5th at p. 463.)

16

"Whether that evidentiary threshold has been met is a question a reviewing court considers in the same manner the trial court does:  by assessing whether the record, viewed in the light most favorable to the prosecution, contains enough evidence of reasonable, credible, and solid value to sustain a guilty verdict on one or more of the qualifying crimes.  [Citations.]"  (*White, supra*, 9 Cal.5th at p. 463.)

Section 12 does not specify that the evidence submitted with respect to a qualifying offense must be admissible at trial, and it has been held that "proffers of evidence may satisfy section 12(b)'s clear and convincing evidence standard without offending federal or state due process principles."  (*In re Harris* (2021) 71 Cal.App.5th 1085, 1101, review granted, Mar. 9, 2022, S272632 (*Harris*).)[3]  Accordingly, we find that the statement of facts and declaration submitted by the district attorney's investigator, from which we have drawn the facts underlying O'Connor's 12 qualifying offenses of child endangerment, constitute a proffer of evidence that is "enough evidence of reasonable, credible, and solid value to sustain a guilty verdict on one or more of the qualifying crimes.  [Citation.]"  (See *White*, *supra,* 9 Cal.5th at p. 463.)

### 3.  Likelihood of Great Bodily Harm

Having determined that O'Connor is charged with qualifying felony offenses within the meaning of section 12(b) that are supported by sufficient evidence in the record to sustain a guilty verdict on one or more of the qualifying felony offenses of child

---

[3] The March 9, 2022 order granting review states:  "The issue to be briefed and argued is limited to the following:  What evidence may a trial court consider at a bail hearing when evaluating whether the facts are evident or the presumption great with respect to a qualifying charged offense, and whether there is a substantial likelihood the person's release would result in great bodily harm to others? (Cal. Const., art. I, § 12, subd. (b).)  [¶]  Pending review, the opinion of the Court of Appeal, which is currently published at (2021) 71 Cal.App.5th 1085, 287, may be cited, not only for its persuasive value, but also for the limited purpose of establishing the existence of a conflict in authority that would in turn allow trial courts to exercise discretion under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456, to choose between sides of any such conflict.  (*In re Harris* (2022) 291 Cal.Rptr.3d 212 [506 P.3d 2].)

endangerment, we next consider the third element required for denial of bail: "To deny bail under article I, section 12(b), a court must satisfy itself that the record contains not only evidence of a qualifying offense sufficient to sustain a hypothetical verdict of guilt on appeal, but also clear and convincing evidence establishing a substantial likelihood that the defendant's release would result in great bodily harm to others." (§ 12(b); *White, supra*, 9 Cal.5th at p. 471.)

Section 12(b) does not include a definition of "great bodily harm." However, in construing Penal Code provisions, our Supreme Court has stated that "great bodily harm" and "serious bodily injury" are equivalent, and mean "[a] serious impairment of physical condition, including, but not limited to the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (*People v. Burroughs* (1984) 35 Cal.3d 824, 831, overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 88-91.)

The standard of review is substantial evidence: "whether any reasonable fact finder could have found, by clear and convincing evidence, a substantial likelihood that the defendant's release would result in great bodily harm to one or more members of the public." (*White, supra*, 9 Cal.5th at p. 471.) In other words, "the danger posed by an arrestee if released on bail is likewise a question of fact we review for substantial evidence." (*Id.* at p. 466.)

We determine that substantial evidence supports the trial court's finding of a substantial likelihood that that O'Connor's release would result in great bodily harm to members of the public, for several reasons. The evidence shows that O'Connor's conduct was closely related to numerous acts of violence that resulted in the "serious impairment of physical condition" of several minor victims over a period of many months. The injuries included John Doe 2's concussion after falling off the back of O'Connor's moving SUV and Jane Doe 1's broken finger requiring surgery.

18

Additionally, many minor victims, including John Does 6, 2, 4, and 5, suffered episodes of vomiting and loss of consciousness due to intoxication after consuming alcohol provided by O'Connor. The female minor victims suffered sexual assaults while they were intoxicated in O'Connor's presence, including John Doe 1's digital penetration of Jane Doe 4 while she was too intoxicated to resist, John Doe 1 making Jane Doe 3 bleed, John Doe 1 climbing on Jane Doe 6 and touching her breasts and buttocks against her will, and John Doe 2 exposing himself and engaging in sexual conduct with Jane Doe 2 against her will. O'Connor was aware of these incidents of serious impairment of the minors' physical condition due to the alcohol she provided. The evidence indicates that she encouraged and facilitated the sexual assaults.

Further, O'Connor's repeated and frequent deceptive and manipulative conduct, as the trial court noted, demonstrates a substantial likelihood that she would continue to seek out minor victims whom she could harm. The evidence shows that O'Connor manipulated the minor victims through social media contacts to attend many secret parties where she provided large quantities of alcohol so that the minors would become intoxicated and be subject to physical impairment and sexual assault. O'Connor also successfully deceived the minor victim's parents, school authorities, and law enforcement on many occasions in her efforts to conceal her activities. She intentionally prevented parents and other authorities from knowing about her harmful interactions with the minors and thus effectively thwarted any intervention that responsible adults could have employed to protect the minors. After her arrest, O'Connor continued her pattern of conduct by dissuading witnesses, including her son John Doe 3, as she had done before her arrest to conceal her participation in the SUV incident in which John Doe 2 suffered a concussion. We therefore determine that any reasonable fact finder could find, by clear and convincing evidence, a substantial likelihood that O'Connor's release would result in great bodily harm to one or more members of the public, particularly minors who have

19

demonstrated to be more vulnerable to her repeated conduct. (See *White*, *supra*, 9 Cal.5th at p. 471.)

### 4. Abuse of Discretion

"A person who falls within the article I, section 12(b) exception does not have a right to bail, yet may nonetheless be granted bail—or release on the person's own recognizance—in the trial court's discretion. (See Ballot Pamp., Primary Elec. (June 8, 1982) analysis of Prop. 4 by Legis. Analyst, p. 16 ['The proposal . . . would broaden the circumstances under which the courts *may* deny bail' (italics added)]; [Citation.] Because this determination calls for an exercise of judgment based on the record before the court, we review a trial court's ultimate decision to deny bail for abuse of discretion. [Citation.]" (*White*, *supra*, 9 Cal.5th at p. 455.)

"An abuse of discretion occurs when the trial court, for example, is unaware of its discretion, fails to consider a relevant factor that deserves significant weight, gives significant weight to an irrelevant or impermissible factor, or makes a decision so arbitrary or irrational that no reasonable person could agree with it. [Citation.]" (*White*, *supra*, 9 Cal.5th at pp. 469-470.)

In *White*, our Supreme Court observed that "[a] different part of the California Constitution—subdivision (f)(3) of article I, section 28—directs courts to take into account the 'safety of the victim' when 'setting, reducing, or denying bail' and to make it, along with public safety, 'the primary considerations.' Because concerns about victim safety would only reinforce the trial court's decision to deny bail here, we need not decide what role, if any, this provision has in the decision to deny bail under article I, section 12(b). Nor do we decide how section 12(b) and section 28, subdivision (f)(3) interact more broadly. In addition, we did not grant review—and do not resolve here— whether, before denying bail, a court must first determine that no condition or conditions of release can adequately protect public or victim safety. Our opinion should not be read as reaching that question." (*White*, *supra*, 9 Cal.5th at p. 470.)

20

Section 28(f)(3) provides in part: "In setting, reducing or denying bail, the judge or magistrate shall take into consideration the protection of the public, the safety of the victim, the seriousness of the offense charged, the previous criminal record of the defendant, and the probability of his or her appearing at the trial or hearing of the case. Public safety and the safety of the victim shall be the primary considerations."

In *Humphrey*, our Supreme Court emphasized that "[t]he voters amended the Constitution to grant the people of this state the right to have the safety of the victim and the victim's family considered in the bail determination process. (Voter Information Guide, Gen. Elec. (Nov. 4, 2008) text of Prop. 9, p. 129.) To that end, they added 'the safety of the victim' to the list of factors that a court shall consider in 'setting, reducing or denying bail' ensuring that it, along with public safety, will be 'the primary considerations' in those determinations. (Cal. Const., art. I, § 28, subd. (f)(3); Pen. Code, § 1275, subd. (a)(1).) Along with those primary considerations of victim and public safety, the court must assume the truth of the criminal charges. [Citations.]" (*Humphrey*, *supra*, 11 Cal.5th at pp. 152-153.)

Another factor emphasized by the *Humphrey* court concerns the conditions of release: "Because [section 12] requires a court to find the specified risk of harm by 'clear and convincing evidence' before detaining an arrestee by denying bail (Cal. Const., art. I, § 12, subds. (b), (c)), we similarly interpret our Constitution to bar a court from causing an arrestee to be detained pretrial based on concerns regarding the safety of the public or the victim, unless the court has first found clear and convincing evidence that no other conditions of release could reasonably protect those interests." (*Humphrey*, *supra*, 11 Cal.5th at pp. 153-154.) The court similarly concluded that "that our Constitution prohibits pretrial detention to combat an arrestee's risk of flight unless the court first finds, based upon clear and convincing evidence, that no condition or conditions of release can reasonably assure the arrestee's appearance in court. [Citation.]" (*Id*. at p. 153.)

However, the *Humphrey* court stated: "We have not been asked to decide and do not determine here whether the California Constitution permits pretrial detention based on risk of nonappearance or flight alone, divorced from public and victim safety concerns. Because this case does not involve an order *denying* bail, we leave for another day the question of how two constitutional provisions addressing the denial of bail— article I, sections 12 and 28, subdivision (f)(3) of the California Constitution—can or should be reconciled, including whether these provisions authorize or prohibit pretrial detention of noncapital arrestees outside the circumstances specified in section 12, subdivisions (b) and (c). (See *In re White*, *supra*, 9 Cal.5th at pp. 470-471)." (*Humphrey*, *supra*, 11 Cal.5th at p. 155, fn. 7.)

In the present case we have concluded that O'Connor's charged felony offenses of child endangerment are qualifying offenses under section 12(b) and therefore we need not, and do not, reach the issue of whether a noncapital arrestee whose offenses do not constitute qualifying offenses under section 12 may be denied bail under the factors set forth in section 28(f)(3).[4] We also need not reach the issue of the interaction of section 12(b) and section 28(f)(3) with respect to the denial of bail. We find, as did our Supreme Court in *White*, that in this case "concerns about victim safety would only reinforce the trial court's decision to deny bail here," and therefore we need not decide what role section 28(f)(3) has in the decision to deny bail under article I, section 12(b). (See *White*, *supra*, 9 Cal.5th at p. 470.)

Here, the trial court in denying bail found that "there is no reason to believe that [O'Connor], who has already left the state and tried to dissuade witnesses, tried to hide or

---

[4] After oral argument, the district attorney submitted a letter pursuant to California Rules of Court, rule 8.254 citing new authority, *In re Kowalczyk* (2022) 85 Cal.App.5th 667. We have considered the decision, which concludes that "that the bail provisions of article I, section 28, subdivision (f)(3) can be reconciled with those of article I, section 12 . . . and that both sections govern bail determinations in noncapital cases." (*Id.* at p. 672.) As stated above, we reach no conclusion on this issue.

secure cash or assets while in custody and facing dozens of felony charges, would respect a Court's order to remain either in her home or the state or any other protective orders that the Court could impose." For those reasons, and because of the seriousness of the charges against O'Connor, which involve minor victims who were injured and sexually assaulted under O'Connor's direction, encouragement or supervision, the trial court found by clear and convincing evidence that less restrictive conditions of release on bail would not protect the public or the minor victims. We have determined that substantial evidence supports the trial court's finding of a substantial likelihood that that O'Connor's release would result in great bodily harm to members of the public, particularly minors who are vulnerable to O'Connor's manipulation. (See *White*, *supra*, 9 Cal.5th at p. 471.)

For these reasons, we conclude that the trial court did not abuse its discretion in denying O'Connor's motion for release on bail, and we will deny her petition for a writ of habeas corpus.

## V. DISPOSITION

The petition for a writ of habeas corpus is denied.

_____
Greenwood, P. J.

WE CONCUR:

_____
Bamattre-Manoukian, J.

_____
Wilson, J.

In re O'CONNOR on Habeas Corpus
H049878

Trial Court:                          Santa Clara County Superior Court
                                      Superior Court No.: C2113375

Trial Judge:                          The Honorable Johnny Cepeda Gogo


Attorneys for Petitioner              J. Brian Madden
Shannon Marie O'Connor:               Madden & Redding

                                      George L. Schraer
                                      Attorney at Law




Attorneys for Respondent              Jeffrey F. Rosen
The People:                           District Attorney, County of Santa Clara

                                      Pablo Wudka-Robles
                                      Deputy District Attorney

                                      Rebekah Wise
                                      Deputy District Attorney Chief Assistant
                                      Attorney General

H049878
In re SHANNON MARIE O'CONNOR on Habeas Corpus